MATTER OF TORRES-TEJEDA

In DEPORTATION Proceedings

A-12336079

*Decided by Board January 3, 1964*

Respondent, a native and national of the Dominican Republic, has not established that because he was a former chief of a military intelligence unit (Servicio de Inteligencia Militar) during the Trujillo regime he would be subject to physical persecution within the meaning of section 243(h), Immigration and Nationality Act, if deported to the Dominican Republic.

CHARGE:

Order: Act of 1952—Section 241(a)(2) [8 U.S.C. 1251(a)(2)]—Nonimmigrant—remained longer.

Respondent, a former chief of a military intelligence unit in the Domnican Republic during the Trujillo regime, appeals from the portion of the special inquiry officer's order which denies his application for withholding of deportation to his homeland. He maintains that he would face physical persecution in the Dominican Republic because of his former position under Trujillo,[1] On the basis of currently available information, we affirm the special inquiry officer's action.

The hearings in respondent's case were held during July and August, 1962. We heard oral argument on October 29, 1962. In the interim, for various reasons, it has not been feasible to render our decision. Over most of the intervening time we have been waiting for information which has only recently become available in final form.

Respondent is a native and national of the Dominican Republic and married. He last entered the United States at New York on December 15, 1961 as a nonimmigrant foreign government official in transit to Canada. He had gone first from the Dominican Republic to Spain where he obtained his transit visa. Respondent testified that the Belaguer government assigned him to the position of 2nd secretary at the Dominican Embassy in Ottawa. He said he did not continue his journey to Canada because he knew most similar assignments had been

---

[1] Section 243(h), Immigration and Nationality Act, 8 U.S.C. 1253(h).

canceled. Respondent's authorized stay in this country expired on January 13, 1962.

The special inquiry officer directed deportation first to Spain, in accordance with respondent's designation, and alternatively to the Dominican Republic. Respondent neither contests deportability nor applies for voluntary departure.

S.I.M. (Servicio de Inteligencia Militar), the organization which respondent headed for about seven or eight months prior to February or March of 1961, was an infamous, quasi-military security unit of Trujillo's regime. The record establishes S.I.M. was popularly identified with carrying out many of the dictatorship's excesses. Respondent testified S.I.M. was created for Trujillo's personal security and to investigate and punish those who would oppose the dictatorship. He said so-called "repressive investigations" involved physical torture applied by a special corps of officers.

Respondent admits that during this tenure as chief of S.I.M. some 50 or 60 political prisoners were executed. He denies any direct responsibility for such acts, contending that he merely transmitted orders from Trujillo himself or from one of Trujillo's trusted lieutenants, Johnny Abbes Garcia. Although respondent had the title of chief of S.I.M., he disclaims any independent individual authority in connection with the principal activities of that agency. He said if he had refused to pass on orders to the persons who would carry them out he himself would have been killed. He also said that he could not refuse to accept the position of chief of S.I.M. when offered to him. In any event, we are not concerned with respondent's guilt or innocence as such. We are concerned only with determining whether, if returned to the Dominican Republic, respondent would be subject to physical abuse which would constitute physical persecution within the statutory concept.

In May the United States District Court for the Southern District of New York recommended Clodoveo Ortiz-Gonzalez' extradition to the Dominican Republic.[2] Ortiz, a former S.I.M. agent, appeared as a witness for respondent in these proceedings. The court ruled against Ortiz on his contention that the offenses with which he was charged were political offenses, hence not extraditable. The court avoided other political implications in the situation, noting that application to the Secretary of State would furnish full protection against delivery of the accused to any government which would not live up to its treaty obligations, and would use the treaty as a subterfuge to secure the accused from a country of political asylum. Subsequently

---

[2] *In re Gonzalez*, 217 F. Supp. 717 (S.D. N.Y. 1963).

the Secretary of State directed Ortiz-Gonzalez's extradition, which has been effected.[3]

Respondent does not clearly set forth the theory underlying his contention that he will be physically persecuted in the Dominican Republic if returned to that country. He anticipates that because of his former position he will be killed.

Respondent believes primarily that upon arrival in his homeland mobs, acting beyond control of the authorities, will violently attack him. Respondent's own testimony reveals that he anticipates possible prosecution in the Dominican Republic because of his association with Trujillo but not unavailability of a fair trial, if prosecuted. Most of the witnesses in respondent's behalf testified that charges are pending, or likely to be brought, against him in the Dominican Republic. They apparently believe he would not receive a fair trial. Moreover, they agree it is highly probable mobs would kill him before the police could take him into custody. At oral argument respondent's counsel said that if by a miracle respondent survived attacks by mobs upon his arrival at the Dominican airport, he would be jailed. Counsel implied that respondent would not receive a fair trial.

Counsel for the Service says respondent fears criminal proceedings and possible conviction in the Dominican Republic. He further states respondent fears more strongly that, before the authorities have a chance to try him, he will be seized by a mob and killed. Neither of these eventualities, according to the Service representative, is comprehended by the statutory language.

We exclude from the term "physical persecution" any governmental action taken in an orderly, judicial manner to determine respondent's responsibility for the former activities of S.I.M., and to prescribe punishment only for acts so performed that, regardless of possible political motivation, they would constitute ordinary crimes under any civilized juridical system. To this extent, at least, we agree with counsel for the Service.

We have no doubt that the populace in the Dominican Republic associates respondent with the excesses attributed to S.I.M. and, rightly or wrongly, holds him responsible for many of them. A newspaper clipping (Ex. 3) refers to testimony at the trial of former S.I.M. agents, accused in the death of the Mirabal sisters, an event well-known in the Dominican Republic. That event excited the public's imagination and aroused its resentment. Respondent admits that he was in charge of S.I.M. when the Mirabal sisters met their deaths. Two of his witnesses corroborated his official position at that time. Yet, whatever the situation at the time of the hearing and oral argument, the

[3] 18 U.S.C. 3184.

subsequent march of events, during which order has been restored in the Dominican Republic, eliminates any need of now considering whether respondent, if deported to the Dominican Republic, would face unrestrained mob violence and whether such violence is equivalent to physical persecution for which deportation may be withheld.

Looking at respondent's evidence in the light most favorable to him, the issue here resolves into two questions. Is respondent likely to be charged in the Dominican Republic with any offense? If so, would any proceedings under that charge reflect fair and adequate judicial processes?

Respondent's counsel stated at oral argument that respondent should not be tried at all because he has not committed a voluntary act which involves the Dominican penal law. Presumably counsel would contend that for this reason any imprisonment would result from a trial so unfair that conviction would be a foregone conclusion. Carrying this argument one step further, counsel would contend that such imprisonment constitutes physical persecution within the purview of section 243(h), Immigration and Nationality Act.

The Court in *Gonzalez* considered a somewhat similar contention. Ortiz-Gonzalez maintained that he acted as a military subordinate obeying the orders of a superior and in the exercise of public authority. The court found that under Dominican law, as under our own, public officials may be criminally liable for acts which fall well outside duly constituted public authority. The court also found that the Dominican Republic had made out a prima-facie case that the extraordinary homicidal acts ascribed to Ortiz fall into this category.

We do not have in this record evidence of respondent's active participation in any killings attributed to S.I.M. such as was before the court in *Gonzalez*. This difference is one of degree, however, since respondent admittedly was involved in the activities of S.I.M. The basic question still goes to the availability of a fair trial under the circumstances here. If respondent has no criminal responsibility under Dominican law for offenses committed by agents of S.I.M. while he was their chief, fair and adequate judicial procedures would afford him sufficient opportunity to establish his innocence.

Ortiz-Gonzalez also alleged that the offenses with which he was charged were political, rather than criminal. The court, as we have noted, rejected this contention as a matter of law, leaving to the Secretary of State any extralegal considerations which might support it.

We are not limited here by the provisions of a treaty and the extradition statute. We need only reach an opinion whether respondent would be physically persecuted in the Dominican Republic. Yet proceedings under section 243(h) of the Immigration and Nationality Act

and extradition proceedings have much in common.[4] Consequently, our function here resembles to some extent the functions of both judicial officers and the Secretary of State in extradition proceedings. In determining whether respondent should be returned to the Dominican Republic we may look broadly at the situation which he would face there.

If respondent is charged in the Dominican Republic with having committed any offenses in behalf of the Trujillo regime, we believe he would receive a fair trial. Although the Trujillo regime considered that prisoners of S.I.M. executed during respondent's tenure as chief of that organization were political prisoners, the circumstances suggest violations of penal provisions of Dominican law. We believe Dominican law, in determining the nature of any offenses with which respondent might be charged and his responsibility in their perpetration, would adequately protect respondent's interests. We rule adversely to respondent on any contention that offenses with which he might be charged were not criminal but political.[5] In particular, we do not perceive that any such offenses were manifestly so political that their punishment might constitute physical persecution.

Our conclusion that respondent's case does not warrant withholding of his deportation to the Dominican Republic rests in part upon official notice of current conditions in the Dominican Republic, in part upon the outcome of *Gonzalez*, and in part upon certain other nonrecord information, privileged under the regulations.[6] None of the available current information indicates that, if returned to the Dominican Republic, respondent is likely to be physically persecuted.

Respondent's counsel contends that the special inquiry officer improperly declined to subpoena certain witnesses. Those witnesses were all former officials of, or otherwise associated with, the Trujillo regime. They left the Dominican Republic about the time of that regime's fall. Their testimony could supply only background information and possibly greater detail about some of the matters of record.

[4] *Matter of Perez-Jiminez*, Int. Dec. No. 1292.

[5] Compare *In re Gonzalez, supra,* and authorities cited therein.

Respondent suggests primarily that he might be prosecuted for "association with evildoers." He relies upon the testimony of witnesses, particularly that of a former lawyer in the Dominican Republic associated with him in S.I.M., to establish the existence of this provision of Dominican law and its effect.

[6] "The determination under section 243(h) of the Act may be based upon information not of record if, in the opinion of the special inquiry officer or the Board, the disclosure of such information would be prejudicial to the interests of the United States" 8 CFR 242.17(c). In our opinion the nonrecord information relied on here comes within this provision.

The Attorney General's use of undisclosed information in exercising his discretion has the approbation of the Supreme Court. *Jay* v. *Boyd*, 351 U.S. 345 (1956); *Millutin* v. *Bouchard*, 370 U.S. 292 (1962).

We do not perceive that their testimony, no matter how favorable to respondent, could overcome the reliable information on which we base our conclusion. We need not consider, therefore, whether the special inquiry officer's refusal to grant respondent's request for subpoenas was error.

We do not discuss other contentions of respondent except to note that he fears a change in government in his native country interrupting the present democratic trend. We answered a similar contention in *Matter of Diaz.*[7] We take official notice that the executive leaders of the Dominican Republic's Government have changed during the pendency of respondent's case on appeal. This change, so far as we can ascertain at this time, has, if anything, lessened any chances that respondent would be physically persecuted in the Dominican Republic. We shall dismiss the appeal.

**ORDER:** It is ordered that the appeal be and hereby is dismissed.

---

[7] Int. Dec. No. 1270.